Before I call the parties, I do want to announce and let everyone know that we will be taking a break, a five-minute break, after we hear this case. and hear the final two cases, before we hear the final two cases. So everyone not connected to this case has at least 35 minutes. All right, at this time, would the appellant step forward and introduce himself? Good morning, my name is Tim Winfield, on behalf of the plaintiff appellant, Monique Binion. May it please the court, there's four issues before the court here today. First one is whether the trial court erred in determining that there was no question of fact regarding the constructive notice of the recurring vandalism involving the elevator in question. Number two, whether the court erred in determining that there was no question of fact regarding whether the appellee had a duty to install tamper-resistant equipment or to warn of the dangers involving vandalism. Number three, whether the court erred in determining that no question of fact existed as to whether the appellee's compliance with the code means that they satisfied their duty. And finally, public policy implications of not imposing a duty to a common carrier to take protective measures against recurring and known vandalism. Leads me to the first point. Question of fact regarding constructive notice, the issue of constructive notice is generally a question of fact. And when we're involving a property, the property owner has a duty to maintain the property in a reasonably safe condition. And therefore, you need actual or constructive notice of the unsafe condition in time to take preventative or protective measures or knowledge of a regular or recurring dangerous condition, which they're bound to foresee. What about your first point? I'm sorry. What about your first point, actual knowledge? I don't think there's any evidence of actual knowledge, so it's strictly constructive knowledge that's the issue. I'm sorry. Regarding notice, under which element does that fall in? Is that proximate cause or is that duty?  If it goes towards duty, what's the analysis that the lower court judge should have engaged in to determine whether or not the society itself imposes a duty on either a common carrier that you referenced or the Chicago Housing Authority in light of the recurring vandalism that occurs to their elevators? I think that's one of the main points that I'm addressing is that there's such a strong issue of public policy argument, especially when you're talking about a common carrier, which has the highest... Are we talking about really collapsing all of your issues into one? There's a lot of overlap between them, but I think they are separate and distinct issues. All right. As far as getting back to the constructive notice, here the case is strikingly similar to Beaufort. In Beaufort, we had a 9-year-old girl who had a similar type of accident involving an elevator in Rockwell Gardens. Here we've got a 12-year-old girl involving an accident with an elevator due to vandalism in Rockwell Gardens. Here in that case, in the Beaufort court, the appellees knew of the recurring dangerous condition. They failed to take preventative measures, even though it did in other elevators. Even though there was vandalism by the third party, the CHA, in that case, the Beaufort case was held to have a duty as a common carrier to protect elevator passengers or to at least warn of the dangerous defects. Here we don't have that at all. Here I think we've got even more knowledge than there was in the Beaufort case. If you look at Fred Carter, the elevator mechanic, he said he's seen it many times, that there were many instances where the vandals would jimmy a gate switch. In fact, he said they used wood, styrofoam, cardboard, paper, many different things to try to do this. Nelson Bollinger, who was the head of the elevator department at CHA, said it was a very common occurrence involving the gate switch tampering. In Rockwell Gardens, he said, also had a high rate of vandalism due to its proximity to the expressway, I think is what he said. In fact, when asked how often this occurs, he says at least on a daily basis involving elevator tampering involving this gate switch. He provided numerous examples as well as far as how these vandals would do this. Using paper, using broomsticks, using a dead roach, using gum, using a quarter, using a spring. Certainly, this is an ongoing thing that the appellees knew about. In fact, they even had a name for it. They dubbed it elevator surfing. So to reach the level where it would give its own nickname, I think, means that it's not just a rare or something that happens occasionally, but something that happens fairly commonly if they even dub it a nickname. Let me go back to the duty question. Because I understand that you presented Buford to the circuit court judge, and she distinguished it. But did she have a case that said that in terms of the duty question, the question of law, that in fact a judge can look to the evidence to determine whether the evidence supports the existence of that duty? Well, I think what the trial court here did was they applied the municipal code and said because there was no evidence of any code violations, that that's what means that the duty was satisfied. And that is not the standard, especially when you're dealing with- Did she have a case that said that? I don't think she said that at all. That looked to the municipal code to determine what the duty is. There was not a case that was cited as far as that. And that's why I think the trial court was in error in this situation, because the whole purpose of the code is to promote health and safety to the public and not to limit legal responsibilities. The code, as Mr. Donnelly, the plaintiff's expert in this case, said, merely sets minimum requirements. It's a question of fact as to what the specific allegations are. The code is certainly something that can be used as evidence, but that does not determine what the particular duty in that particular case is. And here the appellees knew of recurring vandalism, that it was posing a danger, that it was happening at least on a daily basis. And again, this ties in with Buford as well. Because in the Buford case, there was no evidence of code violations, and the appellate court opinion pointed that out. And they said that wasn't the issue there. The question of fact in that case was whether the defendant had a duty to deter vandals, especially given the fact that they're a common carrier with a higher standard of care. So they've got more of a duty than just to comply with the applicable codes. They also need adequate inspection systems, which are not addressed in the code at all. They have a duty to warn, if you look at the Buford opinion. Those are all questionable facts as to whether their inspection in this particular matter was adequate enough, whether they had proper warnings. Those are all issues that pose a clear question of facts that I believe the trial court overlooked. If you look at the inspection system, the inspection that was done in this particular case, inspected it once in the morning and not again for the rest of the day. And if this is a highly used frequency of vandalism, I think the question of fact is, is that sufficient to inspect it the first thing in the morning at 7 o'clock and then hope everything goes well for the rest of the day? Well, what more do you think should have been done? I think that gives rise to the fact that they need to install these tamper-resisting equipment because then they don't have to have a more active inspection system. And what did the circuit court judge say regarding that? The circuit court judge, in our case, she said that you need tamper-proof equipment. I think the trial court set an immensely, incredibly high standard, which is not required. Before a duty could be triggered, she wanted something to establish. She wanted prevention. And I don't think it's possible to prevent vandalism, and that brings me back to the Buford case. In the Buford case, what the defendant in that case was charged with is having assistance to prevent and protect its occupants as a common carrier and not to prevent any acts of vandalism. Because in that case, this was the same ongoing recurrent type of vandalism  In that particular case, the appellate court said... We're very familiar with the case, counsel, if you would just wrap it up. Basically, the appellate court said you don't need to prevent it, but basically just take sufficient actions, even in light of the fact that acts of a third-party vandal, even given that, they still had a duty to take preventative actions to prevent or at least to warn. If you look at everything, including the fact that there's a high public policy and to relieve the defendant of a duty as a common carrier would be setting an extremely dangerous precedent. They're in their best position to foresee and prevent vandals, or to warn, and certainly not to the public that would be using these on a daily basis. We'll give you a couple minutes. If we look at all these issues, we would ask that the trial court vote to be reversed. Thank you. Let's start with the difficult question for me, and that is the mixing or the hybrid nature of the ruling where it seems to be a duty analysis, and yet the duty analysis in this case, the judge focused on the evidence, and normally duty is a question of law for the circuit court or for a court to decide, and we do it not on the basis of the evidence of any particular case, but on what society thinks, where society thinks the burden should lie as to a certain risk. True? Certainly. And in this case, the risk is getting into an elevator that has been vandalized that might put the passengers at risk, and the question is who should be the responsible party? Should the passenger watch out for his own safety, or should the elevator owner or maintenance company, as well as what's termed a common carrier, a CHA in this case, that burden fall on them? Well, Your Honor, certainly the burden should fall on the owners and operators of it. However, the burden can become too great at some point, and I think if we talk about public policy, it seems that that's what the court's addressing. Well, to me, that goes to the evidence, and that goes to liability, and liability isn't something we're addressing here. We're not saying that CHA is liable in this case, and I'm not sure that even a jury might be convinced that they are liable, but it's for the jury to decide once a duty is established, and the question is did the trial court properly cut off the plaintiff's right to go before a jury on this question? Certainly they did, Your Honor, because this was a notice issue, and counsel indicated to you that there were certain facts that should come into play that would lead everyone to believe that there was notice. I don't believe that this is so. I don't think this case is caseable. Can reasonable people disagree on that point, that whether constructive knowledge was inferred, can be inferred based on the evidence, and if so, doesn't that make it a question of fact that should go to the prior effect? I don't believe that's what the court found. I think the court found rightly so that this was a question of law. It was decided properly by the court. I agree with you. That's what the judge said, but I do have a question. Why doesn't Buford stand for the proposition that in the context of recurring vandalism, the law says that constructive notice is a question of fact that should go before a prior effect? Buford should be narrowly construed because it dealt with one specific type of vandalism occurring and reoccurring on certain elevators. That's not the case here, Your Honor. The case here is entirely different. Counsel says there were indications of vandalism with this elevator. However, he didn't say that. And just so it's clear, the very incident at issue here is conceded by all that it was, in fact, caused by vandalism. The door remaining open, the interior door remaining open. Yes. And it was, in fact, by a virtue of a Styrofoam object being placed. That's correct. However, there's no indication. And that wasn't the first time that happened. Well, I can't say it was the first time it happened. However, counsel did depose Mr. Carter, add nauseam, and went through numerous work orders from months before this incident occurred, and there was no indication on any of those of this type of incident occurring on this elevator. Mr. Carter testified that this was not something that occurred on this type of elevator. This was not something that could have been done. But something was happening in those elevators. Well, something was happening, but it's, you know. Let's go to the question about prevention versus authority. Yeah. Something like that. Did the circuit court require a full proof, a vandalism proof, a correction needs to be shown by the plaintiff before a duty can be imposed? No, I don't think they did. I think they just addressed the question that the plaintiffs brought up, that this is certain safety equipment is preventable. I think the authority in Eastlake did more than was needed to prevent this vandalism. It did the only thing that was possible under financial circumstances. What's your best case for the circuit court's ruling? He relies on Buford, and I know you're trying to limit Buford, but what's your best case, or the circuit court's best case, that says that in a constructive notice case, we can look to the evidence that was discovered during discovery to determine whether constructive notice has been shown? You can only look to the evidence to determine if there's constructive notice. It's not something you can just guess at. You have to look at the evidence. In this case, we had a professional mechanic out there examining those elevators. We had two of them out there examining those elevators and working on those elevators. Counsel commented about if you looked at the elevator once, it wouldn't come back the rest of the day. That's not true. It's not accurate. It's not what the deposition said. There were two people out there from 3.30 in the morning, 7.30 in the morning to 3.30 in the afternoon, and there was also a mechanic on call 24-7. We did the best possible thing we could do to prevent vandalism, prevent people from being injured in those elevators. There is one thing to prevent injury in the nature of the injury here where her pant leg was caught in the exterior door. Someone could have pressed the emergency stop button, but that didn't work here, did it? Oh, it didn't work because the code, the state of Chicago code, did not want those emergency stop buttons to be able to be pressed by the public. By code, they were supposed to be locked. They were there for use of the fire department. That's why the stop button didn't work, not what Mr. Carter said. But the code is clear on that. The stop button is there actually for the fire department to be able to open up and get access to the elevator when they needed access to the elevator. There's only one possible way to prevent any type of criminal activity in these elevators, and it's unduly burdensome. It's financially irresponsible. That would be having people stationed in these elevators. I think there was evidence that other elevators had been modified to deter vandalism. The other elevator in the building had been rehabbed at a cost of $400,000 or $500,000. The authority is not made out of money. We're not a taxing body. We just can't get funds. We have to take things one step at a time. And don't forget, we're not talking liability here. We're simply talking the right to go to trial. But I'd still like to hear your best case. I don't think the circuit court was entirely accurate in deciding that there was no notice on this issue based on the fact that a professional mechanic had examined that elevator, had worked on that elevator, put that elevator back in service for a period of three hours' time. So it's a fact-intensive resolution, the facts of this case? Sure. If this court should decide that that's not enough, it's decontrolled havoc into not just the authority, not just elevators, but into all public conveyances. Let's say the similar questions were raised in Buford. And any havoc haven't been caused by Buford? Well, I think because Buford was so narrowly construed and so narrowly ruled on that it did not affect other conveyances such as the CTA buses, metro trains. This, I think, is going to be more widely construed because of the nature of it. And I think, you know, do we want a situation where bus companies have to have a mechanic in each bus 24-7 to make sure the buses? And I think this was the path that this can lead down to. You know, you have made reference to the financial circumstances. You suggested that it might be financially irresponsible for the authority to take certain measures. Is it your position that the scope of the duty, if any, that redounds to the authority is financially driven? No, it's not, Your Honor. However, there's only one possible way, only one possible way, I think, to prevent any type of criminal conduct in those elevators. And how is that? That would be to have people in those elevators 24-7, 365, to have people on the outside of the elevators and every single hallway to protect the hallway doors, the same thing, 24 hours a day, 7 days a week, 365 days a year, and to have relief personnel for those people when they need to use the facility, when they need to go to lunch, when they need to go to dinner. And that would be inappropriate because? That's unduly burdensome on any defendant, and it certainly would be financially not in the realm of what this defendant or I think any common carrier could do. Just so it's clear, Buford said that a warning sign might have been sufficient. Do you recall that language? I don't, Your Honor, but I will take the word. Even a warning sign, a warning sign would have said? Keep away from the doors. The doors may not always work properly. Clothing might get caught. But the doors, and I think that's, I hate to say a red herring, but I think the doors are a red herring in this issue. The doors are not what caused this incident. The doors may have contributed to it, but even if those doors closed and her pant leg gets caught, if there hadn't been criminal conduct altering the gate switch, that elevator doesn't move. That elevator doesn't move. We're not here today. I think the examination should be on the gate switch because that is the cause of what made that elevator move. And there would be no way to protect that gate switch so that somebody could not criminally alter it. Mr. Donnelly, plaintiff's own expert witness, indicated, well, there's a certain cover that can be put on it, and upon my questioning, well, it would take an advertised man 30 seconds with a screwdriver to take it off. We have to understand that people at these developments are very wise in the way of the streets and understand how to do these kinds of things. One other thing I'd like to address is talk about elevator surfing. This case has nothing to do with elevator surfing. I know Carter talked about elevator surfing. Elevator surfing is something entirely different. That's people riding on the top of the elevator, which wouldn't affect the gate switch because they wouldn't need to touch the gate switch. They're up there whether the gate switch is operating functionally or not. As soon as somebody hits the button, they're on the go. All right. Thank you very much, counsel. Thank you. Very briefly. May it please the court? Two minutes, sir. The court has asked us several pertinent questions, and I think the main thing is who should be responsible in this particular situation, and it should clearly be the appellant. The appellee is in this particular case. They're a common carrier. They can have the highest duty, and not the public, especially not nine, 12-year-old girls who are not trained to foresee or inspect elevators or know all dangers in an elevator. The most logical solution to the problem is to have the appellee address the problem, and you've heard arguments that it would be costly or it would be impractical to allow to provide for tamper-resistant equipment. There's been no evidence of that period. There's been no evidence that there was a great cost or that it would be labor-intensive to do that. It's a bunch of arguments but nothing else, and even if it is, that's a question of fact for the jury to determine. How much cost would be too much or how much labor would be too much, that's a question of fact that should be determined by the trial fact and not by the trial court prior to trial. Here we've got a specific act of vandalism. The defendant knew, CHA knew, they had constructive notice of it, and that constructive notice, they claim they didn't have constructive notice, that brings the question of fact. How much notice did they have? How frequently was this occurring? How common was it in this particular elevator or in this particular building in the Rockwell Gardens? These are all questions of fact for the jury to determine. If you look at all the issues involved, all the issues clearly raise questions of facts that should be answered by the prior fact as opposed to the trial court in pretrial rulings. So again, on behalf of the attorney, we would ask that the trial court's ruling be reversed and the case be remanded. All right, thank you very much. We thank both sides, and the case will be taken under advisement. We're going to take a five-minute break.